**JASON GOOLSBY**,

Plaintiff,

v.

**DISTRICT OF COLUMBIA** *et al.*,

Defendants.

Case No. 16-cv-2029 (CRC)

## MEMORANDUM OPINION

It is a sad reality of American life that a white citizen of Washington, D.C. would feel a need to report an African American teenager and his friends to the police for simply congregating in a public establishment. It is also lamentable (but thankfully not tragic in this instance) that the young man, having committed no crime, would feel the urge to run when the police arrived to investigate. Both actions are born of fear on either side of the country's racial divide. But while those fears may animate this case, they do not decide it.

This case instead turns on a miscommunication between the 911 dispatchers who took the citizen's complaint and the patrol officers to whom it was relayed. That the officers received erroneous information about the nature of the complaint immunizes their use of force to detain the young man. And if the miscommunication was simply negligent, which seems likely, then the dispatchers, too, would be immune from suit. The present record, however, does not allow for a definitive determination of the dispatchers' mental state. The Court will therefore await further briefing after limited discovery before reaching that issue.

## I.    Factual Background

Before the Court are motions to dismiss, and on one issue an alternative motion for summary judgment, filed by the individual police officers and dispatchers who are named as

defendants in this case. The District of Columbia joins both sets of motions. Because the defendants have predominantly moved for dismissal, the Court draws the following factual background from Plaintiff Jason Goolsby's Amended Complaint. See, e.g., Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

On October 12, 2015, Goolsby and two other young African-American men walked into the vestibule of a Citibank in the Capitol Hill neighborhood of Washington, D.C. to use an ATM. Am. Compl. ¶¶ 12, 14. A Caucasian family of three—a mother, father, and baby in a stroller—approached. Id. ¶¶ 15–16. Goolsby held the door open for the family to enter. Id. ¶ 17. He then overheard the mother say she had left something in the car, and the family left the bank without using the ATM. Id. ¶ 18.

After leaving, the woman called 911. Id. ¶ 20. She reported to the dispatcher that she felt uneasy about Goolsby and the other two young men standing in the vestibule. Id. ¶¶ 20, 23, 51. The dispatcher then "relayed false and/or misleading information" to several District police officers, informing them that they were responding to "an imminent or already attempted robbery." Id. ¶¶ 26–27, 29–34.

When the responding officers arrived, they observed Goolsby and his friends walking down the street near the bank. Id. ¶¶ 37–38. They then "converged on the teenagers as if they were apprehending a dangerous felon." Id. ¶ 40. One of the officers drove his SUV directly toward Goolsby "at a very high rate of speed" before exiting the car and yelling at Goolsby to get down on the ground or he would pepper spray him. Id. ¶¶ 41–42. Goolsby instead fled. Id. ¶ 42. Following a "short pursuit," the officers caught Goolsby and "violently slamm[ed] [him] to the ground," "twist[ed] [his] arm to a gut-wrenching degree while [he] screamed in pain," and handcuffed him. Id. ¶¶ 44–45, 47.

While Goolsby was handcuffed, the officers contacted the woman who had placed the 911 call. Id. ¶ 48. The woman informed the officers that there had been no robbery, but that she had been alarmed by the young men's presence and thought the police should investigate. Id. ¶¶ 50–51. After speaking to the woman, the officers informed Goolsby that he had been detained because of the 911 call and released him. Id. ¶¶ 53–54. Goolsby alleges that he suffered unspecified "severe injuries to his face, left arm, neck, back, and thighs" at the hands of the officers. Id. ¶ 57.

Goolsby subsequently brought suit against the District of Columbia as well as the individual officers and dispatchers involved in the incident. He alleged violations of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, premised on claims of illegal arrest or seizure, use of excessive force, and deprivation of his due process rights. Id. ¶¶ 78–95. He also raised parallel D.C. law claims for negligence, false imprisonment, assault and battery, and intentional infliction of emotional distress against the individual defendants as well as against the District of Columbia under a respondeat superior theory of liability. Id. ¶¶ 60–77, 96–104.

Goolsby's original complaint was served on the District alone, since he did not know the identities of the individual officers and dispatchers. The District subsequently moved to dismiss or, alternatively, for summary judgment on the D.C. law claims; because the individual defendants had not yet been served, the District's motion did not address any of the section 1983 constitutional claims. On June 8, 2017, the Court held a hearing on the motion to dismiss. It then denied the motion without prejudice, directing the District to identify the individual defendants so as to allow Goolsby to effectuate service. See Minute Order (June 9, 2017). The

Court deferred resolution of the D.C. common law claims pending the individual defendants' responses.  See id.

Goolsby has now filed an amended complaint and effectuated service on the individual defendants.  The individual defendants and the District have again moved to dismiss the case, filing two separate motions: one by the police officer defendants (the "Officers") and one by the dispatcher defendants (the "Dispatchers"), with the District joining both motions as to the respective respondeat superior claims against it.  The Dispatchers have also moved for summary judgment on Goolsby's Fourth Amendment claim.  The Court held a further hearing on May 22, 2018.  It will now grant both motions in part, deny both motions in part, and again reserve ruling on Goolsby's D.C. law claims.

## II.  Legal Standard

### A.  Motion to Dismiss

The District and all individual defendants have primarily moved to dismiss Goolsby's complaint under Federal Rule of Civil Procedure 12(b)(6).  To withstand such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  When resolving a 12(b)(6) motion, the Court must treat as true the factual allegations in the complaint and draw all reasonable inferences in the non-moving party's favor.  See, e.g., Lee v. District of Columbia, 733 F. Supp. 2d 156, 159 (D.D.C. 2010).  However, the Court need not accept legal conclusions in the complaint.  See, e.g., id.

### B.  Motion for Summary Judgment

The Dispatchers have additionally moved for summary judgement on Goolsby's section 1983 Fourth Amendment claims against them.  A party will be granted summary judgment if it

can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P 56(a).  A factual dispute is "material" if the resolution "might affect the outcome of the suit under the governing law" and "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, the Court must "'examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to' the nonmoving party."  Robinson v. Pezzat, 818 F.3d 1, 8 (D.C. Cir. 2016) (citation omitted).

    C.  Qualified Immunity

       The individual defendants have also moved to dismiss the constitutional claims against them on the ground that their actions are protected by qualified immunity.  Public officials will have immunity from suit under section 1983 unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (citation omitted).  The unlawfulness of the official's actions must have been "clearly established at the time" of the official's conduct. District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (citation omitted).  The burden is on the plaintiff "to show that the particular right in question—narrowly described to fit the factual pattern confronting the [official]—was clearly established."  Dukore v. District of Columbia, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (citation omitted).

       To violate a clearly established right, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'"  Wesby, 138 S. Ct. at 589.  Moreover, "the clearly established law must be 'particularized' to the facts of the case."  White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam).  The Supreme Court has cautioned that this specificity and particularity

is "especially important in the Fourth Amendment context, where . . . [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Mullenix, 136 S. Ct. at 308 (alteration in original); see also Wesby, 138 S. Ct. at 590. While this does not require "'a case directly on point,'" "'a body of relevant case law' is usually necessary to 'clearly establish the answer'" in the Fourth Amendment context. Wesby, 138 S. Ct. at 590 (citations omitted). Indeed, the Supreme Court has "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" Id. (citation omitted) (alteration in original); see also Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (per curiam). Cases establishing general principles of law "do not by themselves create clearly established law outside 'an obvious case.'" White, 137 S. Ct. at 552 (citation omitted).

In determining whether qualified immunity will protect the officials in any particular case, the Court applies a two-part test: (1) whether the officials "violated a federal statutory or constitutional right" and (2) whether "the unlawfulness of their conduct was 'clearly established at the time.'" Wesby, 138 S. Ct. at 589 (citation omitted). The Court has the discretion to determine which of the two prongs to proceed on first. Aschcroft v. al-Kidd, 563 U.S. 731, 735 (2011).

## III. Analysis

The Court's opinion will focus on the constitutional claims raised against the individual defendants. Both sets of individual defendants have argued that their actions are protected by qualified immunity. As to the Officers, the Court agrees in full and will dismiss the section 1983 claims against them. But as to the Dispatchers, the Court concludes that a genuine issue of material fact precludes summary judgment on the Fourth Amendment claims and that Goolsby

has pled an alternative Fifth Amendment theory. The Court will thus deny the Dispatchers' motion without prejudice so as to allow limited discovery on their mental state. It will again reserve on Goolsby's D.C. law claims until it has resolved the remaining constitutional claims against the Dispatchers following limited discovery.

## A. Goolsby's Fourteenth Amendment Claims

The Officers and Dispatchers first move to dismiss Goolsby's Fourteenth Amendment claims under section 1983. Goolsby does not contest that the Fourteenth Amendment is inapplicable to the District because it is not a state. See, e.g., Bolling v. Sharpe, 347 U.S. 497, 499 (1954). Consequently, the Court will grant the defendants' motions and dismiss the Fourteenth Amendment claims.

## B. Goolsby's Fifth Amendment Claims

Next, the Officers and Dispatchers move to dismiss Goolsby's Fifth Amendment claims under section 1983. They argue that the Fourth Amendment is the proper constitutional framework to apply here and Goolsby's Fifth Amendment claims should thus be dismissed. Mem. P. & A. Supp. Defs. Albright, Chagnon, McCreary, Brown, Wershable & the District's Mot. Dismiss ("Officers' MTD") at 7–8; Mem. P. & A. Supp. Defs. Banks, Collins & the District's Mot. Dismiss ("Dispatchers' MTD") at 8–9. In response, Goolsby argues that he has pled a Fifth Amendment claim as an alternative theory "in the event that it is determined that no seizure occurred under the facts of this case." Pl.'s Mem. P. & A. Opp'n Officers' MTD ("Pl.'s Opp'n Officers' MTD") at 28; see also Pl.'s Mem. P. & A. Opp'n Dispatchers' MTD ("Pl.'s Opp'n Dispatchers' MTD") at 36.

With respect to section 1983 claims asserted under the Due Process Clause in the Fifth (or Fourteenth) Amendment, the Supreme Court has recognized that if "a particular Amendment

provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (citation omitted). As relevant here, the Fourth Amendment typically governs allegations related to unlawful detention or excessive force. Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014); Lewis, 523 U.S. at 843. However, not every "constitutional claim[] relating to physically abusive government conduct must arise under . . . the Fourth . . . Amendment[]." Lewis, 523 U.S. at 843 (citation omitted). For instance, the Fourth Amendment does not govern "objectionable conduct [that] occur[s] outside of a criminal investigation or other form of governmental investigation or activity." Poe v. Leonhart, 282 F.3d 123, 136 (2d Cir. 2002). Nor does the Fourth Amendment apply if the government never carries out a search or seizure of an individual. See, e.g., Lewis, 523 U.S. at 844.

As to the Officers, Goolsby's primary contention is that the latter situation applies and he has plead an alternative Fifth Amendment claim in case no seizure is found to have occurred. But the facts as alleged here undeniably describe a seizure: Goolsby claims that he was chased by police officers responding to a (misreported) attempted robbery, thrown to the ground, and handcuffed. Am. Compl. ¶¶ 29–34, 44–45, 47; see, e.g., California v. Hodari D., 499 U.S. 621, 626 (1991) ("[A] seizure occurs 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" (citation omitted)). That is, Goolsby alleges a series of facts that fit the prototypical Fourth Amendment case: an unlawful seizure and the use of excessive force during that seizure. Nor has he shown that the first exception might apply. Goolsby pleads only facts indicating the Officers acted with a law enforcement purpose—in response to a call reporting suspicious behavior, Am. Compl. ¶¶ 29–

34. Because Goolsby does not present an alternative set of factual allegations that would fall outside the Fourth Amendment, his Fifth Amendment claims against the Officers must be dismissed.

As to the Dispatchers, however, the Court will deny the motion to dismiss because the first of the two exceptions applies. Goolsby alleges that the Dispatchers "relayed false and/or misleading information" to the Officers. Am. Compl. ¶¶ 26–27. At this juncture, it is unclear whether the Dispatchers acted with a law enforcement motivation or for alternative reasons—as the Court will discuss more below in the Fourth Amendment section, questions remain as to the Dispatchers' precise intent. Thus, Goolsby has stated a plausible (albeit unlikely) alternative Fifth Amendment theory, namely that the Dispatchers acted for non-law enforcement motives. The Court will thus decline to dismiss the Fifth Amendment claims against the Dispatchers at this juncture.

C. Goolsby's Fourth Amendment Claims

Finally, the Officers and Dispatchers have moved to dismiss Goolsby's Fourth Amendment claims on the basis of qualified immunity. The Court will first address the Officers' arguments with respect to Goolsby's false arrest and excessive force claims. It will then turn to the Dispatchers' arguments on both claims.

1. *Officers' Motion to Dismiss*

Goolsby raises a false arrest and an excessive force claim against the Officers, both of which they argue should be dismissed due to qualified immunity.[1] The Court agrees and will dismiss Goolsby's Fourth Amendment claims against the Officers.

---

[1] As the courts of appeals have recognized, Goolsby's unlawful arrest claim and excessive force claim require distinct inquiries. The fact that an officer may have lacked

a. <u>False Arrest</u>

 The Officers are entitled to qualified immunity on Goolsby's false arrest claim unless (1) their actions violated a constitutional right that (2) was clearly established at the time of their actions. <u>See, e.g.</u>, <u>Wesby</u>, 138 S. Ct. at 589. The Court will exercise its discretion to start with the second prong of this test: whether a reasonable officer could have believed the Officers' actions were constitutional under the circumstances. <u>See</u> <u>Ashcroft</u>, 563 U.S. at 735.

First, some relevant constitutional principles. The Fourth Amendment ensures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court has recognized two different kinds of seizures: arrests and more temporary detentions for investigative purposes known as "*Terry* stops" after <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). Ordinarily, an officer must have a warrant supported by probable cause to make an arrest. <u>See, e.g.</u>, <u>Peyton v. New York</u>, 445 U.S. 573, 603 (1980). In contrast, to make a *Terry* stop an officer needs only "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (citation omitted). The distinction between a *Terry* stop and an arrest "is not marked with a bright line." <u>Hall v. District of Columbia</u>, 867 F.3d 138, 153 (D.C. Cir. 2017). However, a *Terry* stop "that is unduly prolonged or intrusive transforms . . . into an arrest requiring probable cause." <u>Id.</u>

Goolsby contends that his seizure was an arrest that required probable cause, while the Officers argue it was simply a *Terry* stop supported by reasonable suspicion. But the Court need

---

reasonable suspicion or probable cause to detain an individual does not necessarily mean that any force used to effectuate that detention was per se excessive. <u>See, e.g.</u>, <u>Velazquez v. City of Long Beach</u>, 793 F.3d 1010, 1024–26 (9th Cir. 2015) (collecting cases).

not resolve this dispute.  Goolsby alleges the following facts:  the officers believed they were responding to a 911 call of an attempted robbery or other crime in progress, Am. Compl. ¶¶ 29–34; approached Goolsby and ordered him to get on the ground, id. ¶¶ 40, 42; in response to which Goolsby fled, id. ¶ 42; the officers pursued him, slammed him to the ground, and handcuffed him, id. ¶¶ 44–45, 47; and then kept him handcuffed while they investigated before releasing him after talking to the 911 caller, id. ¶¶ 48–49, 54.  Based on this series of events, any constitutional violation committed by the Officers was not clearly established.

As an initial matter, Goolsby has not "identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation 'under similar circumstances.'"  Wesby, 138 S. Ct. at 591.[2]  Rather, he cites only to general principles of law—such as the fact that individuals cannot be "detained without reasonable suspicion or arrested without probable cause," Pl.'s Opp'n Officers' MTD at 26—in arguing that any violation here was clearly established.  In light of the Supreme Court's insistence on the importance of the "specificity" of the rule in the Fourth Amendment context, citations to such general principles are insufficient to show that no reasonable officer would have believed the officers' actions in stopping Goolsby were constitutional.  Wesby, 138 S. Ct. at 590 (citation omitted); see also, e.g., Kisela, 138 S. Ct. at 1152–53.

If anything, existing case law at the time of the incident would have suggested to a reasonable officer that the actions taken were permissible.  Starting with Goolsby's seizure, a

---

[2] Goolsby does cite to a recent D.C. Circuit case finding that the plaintiff alleged a constitutional violation on arguably similar facts, Hall v. District of Columbia, 867 F.3d 138 (D.C. Cir. 2017).  But that case was decided in 2017, several years after the events in question. It thus cannot show that any constitutional norms were clearly established at the time of the Officers' conduct.  See, e.g., Kisela, 138 S. Ct. at 1154.

reasonable officer could have believed that she had reasonable suspicion to make an investigative *Terry* stop. For one, the officers believed that they were responding to a 911 call reporting an attempted robbery. Am. Compl. ¶¶ 29–34. The Supreme Court has held that a 911 call, even an anonymous one, can furnish reasonable suspicion to detain someone for investigative purposes. Navarette v. California, 134 S. Ct. 1683, 1692 (2014). And it is perfectly reasonable for officers to rely on the information furnished to them by a dispatcher in the ordinary course, even if that information turns out to be incorrect. See United States v. Hick, 531 F.3d 555, 560 (7th Cir. 2008) (examining whether the officer had reasonable suspicion based on what the officer knew despite miscommunications from the 911 operator); Feathers v. Aey, 319 F.3d 843, 851 (6th Cir. 2003) ("[E]fficient law enforcement requires—at least for purposes of determining the civil liability of individual officers—that police be permitted to rely on information provided by the dispatcher."); cf. Heien v. North Carolina, 135 S. Ct. 530, 534 (2014) ("[A] search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake.").

Next, when the officers asked Goolsby—who matched the description given by the 911 caller—to stop, he fled. Am. Compl. ¶ 42. The Supreme Court has also recognized that fleeing from the police can further support reasonable suspicion for an investigative stop. Illinois v. Wardlow, 528 U.S. 119, 124–25 (2000); see also United States v. Dykes, 406 F.3d 717, 720 (D.C. Cir. 2005) (holding that police officers had reasonable suspicion to stop defendant in known high crime area who fled upon seeing the officers). In sum, case law suggests that, at the very least, a reasonable officer could have believed that he could permissibly temporarily detain Goolsby since he matched the suspect from a 911 call seeming to report criminal activity and fled when ordered to stop by the police. See, e.g., United States v. Johnson, 519 F.3d 478, 482

(D.C. Cir. 2008) (holding officers had reasonable suspicion to detain suspect when, following 911 call about a blue Buick "driving crazy" in a "high drug transaction area," they observed the defendant drive by in such a car, park, cross the street, get into another car, and then attempt to "dart out of the car" upon seeing the police).

Finally, a reasonable officer, having observed Goolsby flee, could have believed that he could place Goolsby in handcuffs during the detention without turning the *Terry* stop into a full-blown arrest requiring probable cause. The D.C. Circuit has repeatedly recognized that "[a] *Terry* stop does not turn into a full arrest merely because the officers use handcuffs and force the suspect to lie down to prevent flight, so long as the police conduct is reasonable." United States v. Jones, 973 F.2d 928, 931 (D.C. Cir. 1992). For instance, in Dykes, the D.C. Circuit held that police officers tackling a fleeing suspect and then placing him in handcuffs did not turn a *Terry* stop into an arrest given that the defendant had been "in full flight" and continued resisting while on the ground and that the officers could reasonably fear that the defendant had a weapon on his person. 406 F.3d at 720. Given the severity of the crime the officers believed was involved (an attempted robbery or other violent crime, see Am. Compl. ¶¶ 29–34) and Goolsby's flight, under case law at the time a reasonable officer could have believed tackling and handcuffing Goolsby was permissible without turning a *Terry* stop into an arrest. As such, the Officers are entitled to qualified immunity on Goolsby's false arrest charges.

### b. Excessive Force

Goolsby also raises excessive force claims, which the Officers again argue should be dismissed because their actions are accorded qualified immunity. The Court will once more exercise its discretion to begin with the second prong of the qualified immunity test: whether any constitutional violation here was clearly established.

Again, some background Fourth Amendment principles. As the Supreme Court has recognized, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). However, the force used must be reasonable under the circumstances. Id. To so determine, the Court looks at "the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

As with the false arrest claims, Goolsby points to no specific cases with similar facts to rebut the Officers' assertion of qualified immunity. Rather, his primary argument is that "a reasonable officer would have known that applying any force would be excessive because there was not even a reasonable suspicion to justify an investigatory stop." Pl.'s Opp'n Officers' MTD at 27. But as noted, Goolsby has pled that the Officers reasonably believed they were responding to an attempted robbery. As a result, they could have reasonably believed they could temporarily detain Goolsby. And even if that conclusion were erroneous, the simple fact that a detention was impermissible does not automatically make the use of force to effectuate that detention excessive. See, e.g., Velazquez v. City of Long Beach, 793 F.3d 1010, 1024 n.13 (9th Cir. 2015) ("Like this court, all other circuits that have addressed the question prohibit a finding of excessive force predicated *only* on the fact of unlawful arrest.").

As to the level of force itself, the Court takes as true the facts as pled by Goolsby. According to his complaint, the officers "violently slamm[ed] [him] to the ground and twist[ed] [his] arm to a gut-wrenching degree while [he] screamed in pain." Am. Compl. ¶ 45. Though not spelled out expressly, the facts as pled suggest that any arm-twisting was intended to

effectuate Goolsby's handcuffing, since Goolsby later pleads he was in handcuffs.  See id. ¶ 47

(noting that Goolsby "found himself shackled in handcuffs").  While this issue presents a

somewhat closer question than in the false arrest claims, the Court ultimately concludes that

qualified immunity is appropriate here, too.

    For one, Goolsby nowhere points to a case with similar facts holding the officers used

excessive force.  This disregards the Supreme Court's counsel that in the context of excessive

force claims, "police officers are entitled to qualified immunity unless existing precedent

'squarely governs' the *specific facts at issue*."  <u>Kisela</u>, 138 S. Ct. at 1153 (emphasis added).  And

this omission is particularly problematic since the level of force, as pled, does not rise to the

level that the Supreme Court or the D.C. Circuit has clearly established as a constitutional

violation, namely the use of force *after* an individual has already been placed in handcuffs or

otherwise subdued.  <u>See, e.g.</u>, <u>Johnson v. District of Columbia</u>, 528 F.3d 969, 975–77 (D.C. Cir.

2008) (holding police officer used excessive force when he repeatedly kicked the groin of a man

already handcuffed and subdued).

    The case law instead suggests that the Officers' use of force was constitutionally

reasonable.  The D.C. Circuit has, in prior cases, sanctioned police officers "slamm[ing] to the

ground, handcuff[ing], and forcibly ke[eping] on the ground" an individual who had been

reported for loitering or using drugs and whose non-compliance and belligerence "suggested he

might try to resist or escape," <u>Cromartie v. District of Columbia</u>, 479 F. App'x 355, 357 (D.C.

Cir. 2012) (per curiam); "shov[ing]" an individual "against a pillar, and violently twisting her

arm" when she refused to comply with orders to stop dancing at the Jefferson Memorial and

officers reasonably felt the need to take decisive action in a crowded setting at night, <u>Oberwetter</u>

<u>v. Hilliard</u>, 639 F.3d 545, 548–49, 555–56 (D.C. Cir. 2011); painfully pressing a non-resisting

man's arm behind him after he was stopped for walking his dog without a leash since his prior

disobedience "suggested that he might try to resist or escape," Wasserman v. Rodacker, 557 F.3d

635, 641 (D.C. Cir. 2009); and "slamm[ing]" an individual "to the ground," "putting [the

officers'] knees on his neck, back, and lower legs," and handcuffing him after the police arrested

him for a DUI, he disobeyed police orders, and he was reasonably perceived of as a flight risk,

Scott v. District of Columbia, 101 F.3d 748, 759 (D.C. Cir. 1996).  All of these cases endorsed

the use of force that, if anything, was more constitutionally suspect than here: a non-cooperative,

potential flight risk who is permissibly slammed to the ground and violently or painfully

handcuffed where the suspected crime was only a minor one.

Admittedly, in finding that no excessive force had been used in these cases, the D.C.

Circuit partially relied on the fact that no serious injury resulted from the encounter.  See

Oberwetter, 639 F.3d at 555; Wasserman, 557 F.3d at 641; Scott, 101 F.3d at 760.  In contrast,

Goolsby alleges that he suffered unspecified "severe injuries to his face, left arm, neck, back, and

thighs for which he sought medical treatment at Washington Hospital Center."  Am. Compl.

¶ 57.

This factual distinction, however, is still not enough to render any constitutional violation

here clearly established.  See Jackson v. District of Columbia, 83 F. Supp. 3d 158, 171 (D.D.C.

2015) (according officers qualified immunity on similar facts despite the fact that the officers

broke the plaintiff's arm when handcuffing her).  The D.C. Circuit has made clear that any injury

to the plaintiff is not dispositive but rather only a factor to consider in determining whether the

level of force used was reasonable.  See, e.g., Wardlaw v. Pickett, 1 F.3d 1297, 1304 n.7 (D.C.

Cir. 1993).  Furthermore, Goolsby points to no case from the D.C. Circuit or the Supreme Court,

and the Court is aware of none, indicating that a severe injury alone suffices to make the degree

of force used here, under these circumstances, unreasonable.  After all, one could argue that the facts alleged point towards a greater degree of permissible force than in the prior D.C. Circuit cases:  Goolsby was in actual flight whereas the plaintiffs in the previous cases only posed a *risk* of flight, and he was suspected of a more serious offense (attempted robbery) than the plaintiffs in the prior cases (*e.g.*, walking a dog without a leash or dancing at the Jefferson Memorial).  Nor does Goolsby point to cases from other courts of appeals that would suggest any injury here clearly rendered the use of force excessive.  Given this absence of cases with similar facts indicating force similar to that used here resulting in "severe injuries" was excessive, any constitutional violation was not clearly established.

To conclude, the Officers' conduct alleged here falls within a gray area between clearly-sanctioned uses of force from cases such as Wasserman, Oberwetter, and Scott and clearly-excessive uses of force from cases such as Johnson.  As such, and given the similarity of these facts to those in Wasserman and Scott, a reasonable officer could have concluded the use of force alleged here was reasonable.  The Court therefore must accord the Officers qualified immunity for their alleged conduct. [3]

---

[3] Goolsby's complaint alleges that all of the officers on the scene committed the allegedly unlawful detention and used excessive force. It does not seem plausible that all of the officers were simultaneously involved in the detention and use of force.  In any case, as to those officers personally involved, the Court has concluded that they should receive qualified immunity.  As to the other officers—against whom Goolsby would have only a bystander liability claim at most—the Court reaches the same conclusion.  A bystander liability claim only lies if the bystander officer knows that the other officer is violating constitutional rights.  See, e.g., Matthews v. District of Columbia, 924 F. Supp. 2d 115, 118 (D.D.C. 2013).  If it was not clearly established that the principal officer was violating constitutional rights, it follows that it is not clearly established that the bystander officer should know the officer was violating constitutional rights.  Consequently, it would not be clearly established that the bystander officer would be liable for a failure to intervene.

## 2. *Dispatchers' Motion to Dismiss*

Goolsby also asserts Fourth Amendment unreasonable seizure and excessive force claims against the Dispatchers. He contends that section 1983 encompasses liability for any government actor who "was directly responsible for the constitutional deprivation" or who "gave authorization or approval of such misconduct." Pl.'s Opp'n Dispatchers' MTD at 20. Since the Dispatchers are not alleged to have authorized the Officers' conduct or approved of it—indeed, they were not physically present during any of the events that occurred and have no supervisory or other authority over the Officers—the argument is simply that the Dispatchers' affirmative act of providing false or misleading information to the Officers set in effect a chain of events leading to Goolsby being unlawfully arrested and subjected to excessive force. Pl.'s Opp'n Dispatchers' MTD at 20–21.

The Dispatchers respond that they should be granted summary judgment because their actions are protected by qualified immunity. Dispatchers' MTD at 13–14. In their view, no cases put them on notice that "in providing incorrect information to police officers [they] could be held liable for the constitutional torts of the officers." Id. at 14. The Court ultimately concludes that qualified immunity is appropriate as to Goolsby's excessive force claims against the Dispatchers, but that a genuine issue of material fact precludes summary judgment as to his false arrest claims.

### a. False Arrest

Beginning with the false arrest claims, the Court will again start with the second prong of the qualified immunity analysis: whether any violation by the Dispatchers was clearly established. Goolsby once more cites no relevant cases, here ones involving dispatchers held liable for false arrest under section 1983. The only relevant court of appeals decisions the Court

is aware of—all of which reviewed summary judgment grants to dispatchers—held the dispatcher not liable because he acted negligently or within the scope of his discretion. For instance, a Sixth Circuit opinion held that in the absence of "deliberate indifference or recklessness" by two dispatchers, the plaintiff lacked "a basis to hold the . . . dispatchers accountable for a seizure in which they did not directly participate" under section 1983. Smoak v. Hall, 460 F.3d 768, 785 (6th Cir. 2006); see also Fettes v. Hendershot, 375 F. App'x 528, 532 (6th Cir. 2010) (affirming summary judgment on section 1983 claim against dispatcher because the dispatcher's actions were only negligent); Drakeford v. County of Orange, 213 F. App'x 542, 544–45 (9th Cir. 2006) (affirming grant of qualified immunity to dispatchers in light of the discretion accorded them in exercising their official duties).

That said, though neither side points to it, there is a common law tradition—albeit one that does not specifically involve dispatchers—that suggests a scenario under which a violation might be clearly established. The Supreme Court has recognized that when section 1983 was passed, "the generally accepted rule was that one who procured the issuance of an arrest warrant by submitting a complaint could be held liable if the complaint was made maliciously and without probable cause." Malley v. Briggs, 475 U.S. 335, 340–41 (1986); see also Kallina v. Fletcher, 522 U.S. 118, 127 n.14 (1997) (quoting the preceding language from Malley). This is in line with the general tort law principle that one who instigates a false arrest, such as by directing a police officer to arrest someone without any suspicion of wrongdoing, is also liable for false arrest or imprisonment. See, e.g., Restatement (Second) of Torts § 45A ("One who instigates or participates in the unlawful confinement of another is subject to liability to the other for false imprisonment."). Combined, these rules would seem to put any reasonable dispatcher on notice that certain kinds of false reports might violate the Fourth Amendment, namely

maliciously misleading police officers without suspicion of wrongdoing in a manner that leads to another's detention.[4]

In light of this legal background, the Court concludes that a genuine issue of material fact precludes summary judgment at this juncture. The current record reveals that the dispatchers did, in fact, make incorrect factual statements to the Officers. For instance, the 911 call transcript shows that the caller stated that she "felt like if [she and her husband] had taken money out [they] might've gotten robbed," Dispatchers' MTD Ex. 1, at 1, but a dispatcher later told an officer that the caller "state[d] that [Goolsby and his companion] were trying to rob him" and "that these subjects were trying to rob people at the ATM," Pl.'s Opp'n Dispatchers' MTD Ex. 1, at 2:13–16.[5] Other officers in their statements described the dispatcher's report as a "radio run for a possible robbery," Pl.'s Opp'n Dispatchers' MTD Ex. 3, at 6, "a call for a[n] attempted robbery," id. at 7, or "a radio run for a possible attempt robbery," id. at 9. All of this suggests that misinformation was given to the police.

The most natural explanation for the erroneous information passed along is simply negligence or confusion on the part of the dispatcher. But it could also be the case that the dispatcher intentionally misdirected the patrol officers for some nefarious purpose. The current record is devoid of any direct evidence speaking to the Dispatchers' mental state; there are no depositions or sworn affidavits that explain why they apparently misrepresented the citizen's

---

[4] The Court is cognizant that neither party discussed Malley or Kallina. As such, it invites the parties in future briefing to address what specific violations of law are clearly established given the case law and general tort law principles referenced in this Memorandum Opinion.

[5] Which particular dispatcher and which particular officer is not clear on the transcript. See Pl.'s Opp'n Dispatchers' MTD Ex. 1.

complaint to the officers.  While the record evidence is certainly consistent with negligence—it is not a difficult to imagine a dispatcher inadvertently turning "thought I might be robbed" to "attempting to rob," particularly in a fast-moving situation—it does not foreclose the possibility of intentional conduct.  Since the dispatcher's mental state is relevant to whether a section 1983 claim has been stated or a clearly established violation occurred, the current factual record yields a genuine issue of material fact that precludes summary judgment at this juncture.

The Court appreciates its obligation to "exercise its discretion in a way that protects the substance of the qualified immunity defense" and to ensure that "officials are not subjected to unnecessary and burdensome discovery or trial proceedings."  Crawford-El v. Britton, 523 U.S. 574, 597–98 (1998).  Therefore, while the Court will deny without prejudice the Dispatchers' motion for summary judgment on the false arrest claims, it will not allow the parties to begin full merits discovery.  Instead, it will allow only limited discovery into the Dispatchers' mental state since such discovery is necessary to resolve the qualified immunity question.  Following this limited discovery, the parties will be free to re-brief summary judgment as to the constitutional claims remaining against the Dispatchers—including the Fifth Amendment claim discussed above and the issue of whether the Dispatchers violated any clearly established Fourth Amendment principles—before progressing further into discovery and the merits of the case.

### b.  Excessive Force

Goolsby also raises excessive force claims against the Dispatchers.  As with the false arrest claim, Goolsby cites no case law that has ever found a dispatcher liable for a police officer's use of force.  Nor is the Court aware of any.  While the cases discussed above might support possible *false arrest* claims against the Dispatchers, they provide no indication that the Dispatchers might be liable for *excessive force* claims.  In the absence of any case law suggesting

that a dispatcher can be held liable for a police officer's use of excessive force, the Court

concludes that any constitutional violation here is not clearly established.  Dismissal of the

excessive force claims against the Dispatchers is thus appropriate on the basis of qualified

immunity.[6]

D.  <u>Goolsby's D.C. Law Claims</u>

The defendants have, again, raised arguments for the dismissal of Goolsby's D.C. law

claims.  Because the Court has not yet resolved the Dispatchers' qualified immunity defense—

and, indeed, retains doubts as to whether the remaining claims will survive qualified immunity

following limited discovery and summary judgment briefing—it will again reserve on the

arguments that remain on Goolsby's D.C. law claims pending the outcome of summary judgment

on qualified immunity.

\* \* \*

For the foregoing reasons, the Court will grant in part and deny in part both motions to

dismiss as detailed above.  A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>July 13, 2018</u>

_____

[6] The dismissal of the excessive force claim does not necessarily preclude Goolsby's
ability to recover damages related to the use of force.  As courts of appeals have recognized,
damages awarded on a false arrest claim can potentially include damages related to the use of
force to effectuate the arrest.  <u>See</u> <u>Velazquez</u>, 793 F.3d at 1024 n.13; <u>Bashir v. Rockdale County</u>,
445 F.3d 1323, 1332 (11th Cir. 2006); <u>Bodine v. Warwick</u>, 72 F.3d 393, 400 (3d Cir. 1995).