**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JASON GOOLSBY**, | |
| Plaintiff, | |
| v. | Case No. 16-cv-2029 (CRC) |
| **DISTRICT OF COLUMBIA** *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

On an October day in 2015, Jason Goolsby was pondering whether to withdraw money from an ATM outside a Citibank in Washington, D.C. From inside the ATM vestibule, Goolsby saw a young couple with a child in a stroller approaching and, he says, held the door to help them in. The mother, Caucasian, apparently felt uneasy in the presence of Goolsby and his two friends, all African-American. So she told her husband that she forgot something in the car, immediately left the vestibule, and called the police. What transpired next is the subject of this lawsuit.

Goolsby alleges that dispatchers in the District of Columbia Metropolitan Police Department ("MPD") misreported the woman's 911 call and that responding MPD officers attacked him without good reason. He brought a spate of federal constitutional and D.C. common-law claims, seeking redress for the injuries he allegedly sustained. In an earlier decision considering only the constitutional claims, the Court held that the dispatchers and officers were entitled to qualified immunity and dismissed all but one of the claims. Turning now to the defendants' motion to dismiss the common-law claims—with the barrier of qualified immunity no longer standing in the way—the Court reaches a different result: almost all of Goolsby's common-law claims survive dismissal and must proceed to discovery.

## I.   Background

### A.  Factual History

On a motion to dismiss, a plaintiff's factual allegations must be taken as true, <u>Lee v. District of Columbia</u>, 733 F. Supp. 2d 156, 159 (D.D.C. 2010), so the facts set forth here are taken exclusively from Goolsby's rendering.[1]  The defendants no doubt dispute certain aspects of his account.

On October 12, 2015, Goolsby and two other young African-American men walked into the vestibule of a Citibank in the Capitol Hill neighborhood of Washington, D.C. to use an ATM. Am. Compl. ¶¶ 12, 14.  A Caucasian family of three—a mother, father, and baby in a stroller—approached.  <u>Id.</u> ¶¶ 15-16.  Goolsby held the door open for the family to enter.  <u>Id.</u> ¶ 17.  He then overheard the mother say she had left something in the car, and the family left the bank without using the ATM.  <u>Id.</u> ¶ 18.

After leaving, the woman called 911.  <u>Id.</u> ¶ 20.  She reported to the dispatcher that she felt uneasy about Goolsby and the other two young men standing in the vestibule.  <u>Id.</u> ¶¶ 20, 23, 51. The dispatcher then "relayed false and/or misleading information" to several District police officers, informing them that they were responding to "an imminent or already attempted robbery."  <u>Id.</u> ¶¶ 26-27, 29-34.

When the responding officers arrived, they observed Goolsby and his friends walking down the street near the bank.  <u>Id.</u>  ¶¶ 37-38.  They then "converged on the teenagers as if they were apprehending a dangerous felon."  <u>Id.</u> ¶ 40.  One of the officers drove his SUV directly

---

[1] The factual history is largely taken from the Court's previous ruling on the federal-law claims.  <u>Goolsby v. District of Columbia</u>, 317 F. Supp. 3d 582, 586-88 (D.D.C. 2018).

toward Goolsby "at a very high rate of speed" before exiting the car and yelling at Goolsby to get down on the ground or he would pepper spray him.  Id. ¶¶ 41-42.  Goolsby instead fled.  Id. ¶ 42.  Following a "short pursuit," the officers caught Goolsby and "violently slamm[ed] [him] to the ground," "twist[ed] [his] arm to a gut-wrenching degree while [he] screamed in pain," and handcuffed him.  Id. ¶¶ 44-45, 47.

While Goolsby was handcuffed, the officers contacted the woman who had placed the 911 call.  Id. ¶ 48.  The woman informed the officers that there had been no robbery, but that she had been alarmed by the young men's presence and thought the police should investigate.  Id. ¶¶ 50-51.  After speaking to the woman, the officers informed Goolsby that he had been detained because of the 911 call and released him.  Id. ¶¶ 53-54.  Goolsby alleges that he suffered unspecified "severe injuries to his face, left arm, neck, back, and thighs" at the hands of the officers.  Id. ¶ 57.

B.  Procedural History

Goolsby subsequently brought suit against the District of Columbia as well as the individual officers and dispatchers involved in the incident.  He alleged violations of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, premised on claims of illegal arrest or seizure, use of excessive force, and deprivation of his due process rights.  Id. ¶¶ 78-95.  He also raised parallel D.C. law claims for negligence, false imprisonment, assault and battery, and intentional infliction of emotional distress against the individual defendants as well as against the District of Columbia under a *respondeat superior* theory of liability.  Id. ¶¶ 60-77, 96-104.

The Defendants moved to dismiss the suit in its entirety.  In an earlier ruling, the Court dealt only with the federal-constitutional claims, finding all of them—except for a false arrest

claim against the dispatchers—barred by qualified immunity. Goolsby, 317 F. Supp. 3d at 596. Shortly thereafter, the parties stipulated to the dismissal of that claim. Stipulation of Dismissal, ECF No. 45. At the same time, the parties asked the Court to retain jurisdiction over the D.C. common-law claims. Joint Motion Requesting that the Court Retain Supplemental Jurisdiction, ECF No. 44. The Court granted the motion, and after the parties informed the Court that no further briefing on the common-law claims was necessary, the matter is now ripe for the Court's resolution.

## II. Legal Standard

The District and all individual defendants have moved to dismiss Goolsby's complaint under Federal Rule of Civil Procedure 12(b)(6). To withstand such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When resolving a 12(b)(6) motion, the Court must treat as true the factual allegations in the complaint and draw all reasonable inferences in the non-moving party's favor. See, e.g., Lee, 733 F. Supp. 2d at 159. However, the Court need not accept legal conclusions in the complaint. See, e.g., id.

## III. Analysis

The Court will address each common-law claim in the order it appears in the complaint, splitting the analysis, where appropriate, for the dispatchers and the responding police officers.

### A. Count I: Negligence

"The elements of a cause of action for negligence are [1] a duty of care owed by the defendant to the plaintiff, [2] a breach of that duty by the defendant, and [3] damage to the interests of the plaintiff, [4] proximately caused by the breach." Taylor v. District of Columbia,

776 A.2d 1208, 1214 (D.C. 2001). Goolsby contends that the dispatchers and the responding officers breached their duty of care to him by conveying false or inaccurate information from a citizen's 911 call, failing to investigate the information provided in the dispatch in order to "accurately assess and respond to a potential criminal situation[,]" stopping a citizen without reasonable and articulable suspicion, and using excessive force in detaining him. Id. at ¶¶ 61-63. The dispatchers counter that Goolsby has failed to plead facts that could establish the duty and causation elements. The officers, for their part, argue that Goolsby's negligence claim is improperly pled because his allegations in support of the claim are coextensive with his allegations in support of his intentional tort claims. The Court disagrees on both fronts.

### 1. Dispatchers

The dispatchers submit that Goolsby's allegations, even if taken as true, fail to establish the duty and causation elements of a negligence claim.

Turning first to duty, the critical question is whether the District of Columbia's "public duty" doctrine—which holds that law enforcement personnel "are not generally liable to victims of criminal acts for failure to provide adequate police protection"—applies to the facts in this case. Warren v. District of Columbia, 444 A.2d 1, 4 (D.C. 1981). The District of Columbia Court of Appeals has applied the public duty doctrine to a wide range of emergency-services personnel. See Hines v. District of Columbia, 580 A.2d 133 (D.C. 1990) (expanding the doctrine to shield city ambulance drivers); Wanzer v. District of Columbia, 580 A.2d 127, 129, 132 (D.C. 1990) (holding that the doctrine barred a suit alleging death resulting from delayed dispatch of an ambulance); Johnson v. District of Columbia, 580 A.2d 140, 143 (D.C. 1990) (reasoning that the facts pled "could not sustain liability insofar as they merely represent the failure of the firefighters to perform any particular step that might have alleviated [the decedent's] condition").

When the doctrine applies, liability is barred unless the plaintiff can establish that he was in some special relationship with the defendant.  Turner v. District of Columbia, 532 A.2d 662, 667 (D.C. 1987); Hines, 580 A.2d at 138.

Crucially, though, the public duty doctrine typically applies in cases where a plaintiff complains about law enforcement's *failure* to act.  See Liser v. Smith, 254 F. Supp. 2d 89, 102 (D.D.C. 2003) (collecting cases); District of Columbia v. Evans, 644 A.2d 1008, 1017 n.8 (D.C. 1994) (explaining that the public duty doctrine "deals with the question whether public officials have a duty to protect individual members of the general public against harm from third parties or other independent sources").  Here, however, Goolsby complains that it was the dispatchers' (and the responding officers') affirmative misconduct—rather than their failure to protect—that caused his injuries.  He alleges that the dispatchers "passed on false information to the MPD Officers," Pl's Opp., ECF No. 25, at 15, an affirmative act that he says caused the responding officers to respond over-aggressively, id. at 16.  Because the "harm was brought about *directly by the government itself*" and because "there is no allegation of a 'failure to protect'" from third-party harm, Goolsby contends the public duty doctrine is inapplicable.  Id.

Goolsby is correct, as comparison to other cases applying D.C. negligence law confirms. To start, take Liser.  The plaintiff there sued the police for negligence after they released a photograph of him as a suspect in a murder investigation and subsequently arrested him.  254 F. Supp. 2d at 101.  Though the defendants asserted the public duty doctrine to avoid liability, the court held that it was "wholly inapposite in a case . . . where the alleged harm was brought about *directly* by the officers themselves, and where there is no allegation of a failure to protect."  Id. at 102 (emphasis added) (quoting Evans, 644 A.2d at 1017 n.8).  The court continued: "The claim that the government has no general duty to protect particular citizens from injury is simply a non-

sequitur where the government itself is solely responsible for that injury, which it has caused by the allegedly negligent use of its own police powers." Id.

Now, contrast Liser with cases that applied the public duty doctrine. In Warren, for instance, the D.C. Court of Appeals held that a dispatcher owed no duty to a 911 caller reporting a home invasion in progress—but that was because the dispatcher's mistake resulted in a failure to protect the plaintiffs from the burglars. 444 A.2d at 7. In other words, the Warren plaintiffs complained of "omissions and failures [that] constituted no more than a [] withholding of a benefit." Id. Here, however, to repeat the distinction, Goolsby alleges that the MPD's affirmative acts alone inflicted his injuries. And even the Warren court acknowledged that "anyone—police or civilian" is liable for acts of "affirmative negligence." Id.[2]

Because the Court concludes that the dispatchers were duty-bound not to cause Goolsby injury, the question now becomes whether Goolsby has alleged facts sufficient to establish proximate cause. The dispatchers say that he has failed to plead both the cause-in-fact and policy components of proximate cause. Dispatchers' MTD at 10.

The dispatchers' conduct counts as a cause-in-fact of Goolsby's injuries if it was a "substantial factor in bringing about the harm." District of Columbia v. Carlson, 793 A.2d 1285, 1288 (D.C. 2002) (quotation omitted). Taking Goolsby's factual allegations as true, it would be strange to say that the inaccurate information relayed by the dispatchers was not a substantial factor in his ultimate injuries. Had the dispatchers not reported an attempted robbery, it is unlikely that the officers would have approached Goolsby in the first place. Moreover, even

---

[2] Because the Court concludes that the public duty doctrine is inapplicable to these facts, it need not reach the question whether a special relationship existed between Goolsby and the dispatchers.

assuming that the officers would have approached Goolsby regardless of the dispatchers' mistake, the officers may have responded in a less aggressive and frightening manner—and Goolsby would not have fled nor been arrested in the rough manner he alleges. <u>See</u> Pl's Opp. at 15-16. Therefore, the Court cannot say that the facts pled by Goolsby fail to establish cause-in-fact.

The policy question presents a closer call, but Goolsby again has the better of the argument. "The 'policy element' of proximate cause includes various factors which relieve a defendant of liability even when his actions were the cause-in-fact of the injury." <u>Carlson</u>, 793 A.2d at 1290. Chief among these factors is foreseeability: if the "chain of events leading to the injury appears 'highly extraordinary in retrospect,'" a defendant may not be held liable. <u>Id.</u> (quoting <u>Morgan v. District of Columbia</u>, 468 A.2d 1306, 1318 (D.C. 1983) (en banc). Such "extraordinary" cases often involve intervening acts that render the "causal connection between the defendant's negligence and the plaintiff's injury more attenuated." <u>Id.</u>

The dispatchers say that Goolsby's decision to flee functioned as an unforeseeable intervening act that broke the proximate-causation chain. They point to <u>Hundley v. District of Columbia</u>, 494 F.3d 1097 (D.C. Cir. 2007), for support. In that case, a police officer ordered Brian Hundley to stop and began approaching him. <u>Id.</u> at 1099. As he got closer, the officer said that Hundley lunged at him; the officer responded by shooting Hundley, ostensibly in self-defense. <u>Id.</u> A jury found that the officer was negligent in stopping Hundley in the first place, and that the negligent stop proximately caused Hundley's death. <u>Id.</u> The D.C. Circuit reversed, holding that "it is not ordinarily reasonable to foresee that a citizen will react to a police stop by attacking the detaining officer, thereby triggering a situation that requires the officer to use deadly force in self-defense." <u>Id.</u> at 1105.

But Hundley is different than this case.  While it may not be reasonably foreseeable that a citizen will *attack* an approaching police officer, it is foreseeable that a citizen will *flee* from one—especially when the citizen believes he has done nothing wrong and the police approach as aggressively as Goolsby alleges.  Said another way, the former is "an intervening act or force" that is not "a normal consequence of [the allegedly negligent] acts"; the latter very much is.  65 C.J.S. Negligence § 206 (2007) (discussing intervening causes).  But even assuming that both fight and flight are unforeseeable reactions, more pressing policy concerns—ones not nearly as prominent here—clearly animated the D.C. Circuit's conclusion in Hundley.  494 F.3d at 1105 (stating that "police officers could not protect the public if tort law deterred them from approaching and detaining potentially violent suspects").  The Hundley court even offered a hypothetical to illustrate what it saw as the "obviously absurd" implications of the jury verdict:

> Suppose, for example, that A unintentionally but negligently drives into B's car.  Suppose that B then gets out of his car and attacks A with a knife.  What can A do in those circumstances?  Under plaintiffs' theory, A could not lawfully defend herself and thus would be liable for any injuries she inflicted on B while fending off B's attack.

Id.  In other words, an officer's negligent stop—illustrated by A's negligent driving—should not mean the officer can defend himself only at the expense of tort liability.

The Court fails to see how allowing this case to proceed to summary judgment portends anything like the perverse situation imagined in Hundley.  Again, the jury verdict in Hundley meant that, even if a suspect responded violently to an officer's approach, the officer might be on the hook civilly for any ensuing injuries.  That would put police in a serious predicament, and understandably might deter them from initiating legitimate stops.  Here, by contrast, nothing in the Court's ruling means officers must risk liability for defending themselves in response to a

suspect's violent actions; it means only that officers can be held accountable for using unreasonable force when a suspect flees.

In sum, the Court concludes that Goolsby's decision to flee does not preclude a finding of proximate cause. It was reasonably foreseeable that the dispatchers' relaying of false information might cause the responding officers to approach Goolsby over-aggressively and ultimately lead to his alleged injuries.

### 2. Officers

The officers take a different tack to secure dismissal of Goolsby's negligence claim. They contend that Goolsby's complaint improperly conflates his negligence claim with his intentional tort claims, in particular his excessive force claim. Under D.C. law, "negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care." District of Columbia v. Chinn, 839 A.2d 701, 711 (D.C. 2003). The officers charge that Goolsby's complaint does not pass muster under Chinn, since the facts underpinning his negligence claim are the same facts supporting his assault and battery, false imprisonment, and excessive force claims.

Goolsby's response is two-fold: first, he says he has alleged enough facts to support a negligence theory that is independent of his other claims, and, second, contrary to the government's assertion, he says D.C. law permits claims based on the same facts to go forward under different tort theories. To his first point, Goolsby suggests that the government is cherry picking amongst his claims because two of his examples of negligent conduct are wholly distinct from his intentional tort claims: the officers' failure (1) to investigate the reported crime in order to verify and appropriately respond to the situation, and (2) to prevent other officers from using

unreasonable and unnecessary force.  See Pl's Opp. at 18-19.  This alone defeats the

government's argument, Goolsby contends, because he has articulated "an aspect of negligence

apart from the use of excessive force itself" that is "violative of a distinct standard of care."  See

Chinn, 839 A.2d at 711.  And if this claim proceeds to discovery, Goolsby will develop

evidence, presumably through expert testimony, to support his allegations that the officers

deviated from the standard of care.  As for his second point, Goolsby asserts that the government

mischaracterizes Chinn and other relevant case law, which actually permits intentional tort and

negligence claims regarding police misconduct to be submitted to the jury based on the same

facts.  Id. at 20 (citing District of Columbia v. Downs, 357 A.2d 857 (D.C. 1976); District of

Columbia v. White, 442 A.2d 159 (D.C. 1982); Etheredge v. District of Columbia, 635 A.2d 908

(D.C. 1993)).

Start with Goolsby's second point.  He is right that a plaintiff can plead both negligence

and intentional tort claims on the same basic set of facts—but the officers are correct that the

plaintiff must still "ple[a]d and establish[] separate and distinct claims."  Chinn, 839 A.2d at 710.

Chinn explained how previous plaintiffs successfully brought both negligence and excessive

force claims:

> Each involve[d] the use of deadly force.  Each invoke[d] a police regulation
> establishing a standard of care with respect thereto that is arguably distinct from
> the excessive force standard.  Each involve[d] alternate scenarios in at least one of
> which a distinct act of negligence, a misperception of fact, may have played a part
> in the decision to fire.  Each involve[d] a negligent act that precedes the
> application of the relevant force of resort to firearms, i.e., prior to the pulling of
> the trigger.

Id. at 710-11.

So that brings us back to Goolsby's first point—whether he has pled the requisite

elements of a negligence claim, including a distinct standard of care and a breach of that standard

of care. The Court finds that he just barely has done so. Paragraph 62 of his complaint is most relevant here:

> [The officers] owed a duty of care to Jason to use reasonable measures in their investigation of a 911 call and in their treatment of Jason. These duties included; *inter alia*, . . . investigating a 911 caller's claims of potential crimes in order to accurately assess and respond to a potential criminal situation; not stopping a suspect without reasonable and articulable suspicion that a crime has been committed; and protecting suspects from bodily harm through the use of only reasonable and necessary force, to include preventing fellow MPD officers from employing excessive force.

Am. Compl. ¶ 62. Though Goolsby purports to expound on the applicable standards of care in the following paragraph, there he quite clearly conflates his negligence claims with his intentional tort claims, speaking exclusively in the language of battery, excessive force, and the like. Id. ¶ 63.

In the excerpt quoted above, the only standards of care distinct from the standards governing his intentional tort claims are the allegations related to the duty to "investigat[e] a 911 caller's claims of potential crimes in order to accurately assess and respond to a potential criminal situation" and the duty to "prevent[] fellow MPD officers from employing excessive force." Id. ¶ 62. Though Goolsby does not expound on the source or requirements of these standards—or how they differ meaningfully from the standards relevant to his intentional tort claims—he may be able to do so with the aid of discovery. See White, 442 A.2d at 163 (discussing how plaintiff used "police regulation on safe use of firearms" to substantiate negligence claim). Accordingly, the Court will deny the officers' motion to dismiss Goolsby's negligence claim. The Court notes, however, that Goolsby should, if he wishes to survive summary judgment, develop with greater specificity the standards of care applicable to his negligence claim and explain how those standards are distinct from those governing his intentional tort claims.

B.  Count II: False Imprisonment

    *1.  Dispatchers*

The dispatchers contend that a cause of action for false imprisonment cannot lie against them since they did not participate in the actual on-scene investigation and stop of Goolsby.  But the dispatchers cite no case to support that proposition, and the Court has found authority pointing in the opposition direction.  In Amobi v. District of Columbia Department of Corrections, the D.C. Circuit held that a third party could be liable "for the procuring of a false arrest and imprisonment if by words, one directs, requests, invites or encourages the unlawful detention of another."  755 F.3d 980, 990 (D.C. Cir. 2014) (citation omitted).  However unlikely it is that Goolsby can ultimately prove that the dispatchers "consciously misstate[d] the facts . . . for the purpose of inducing action by the police," Vessels v. District of Columbia, 531 A.2d 1016, 1020 (D.C. 1987), he is entitled the opportunity to do so through discovery.  The dispatchers' motion to dismiss Goolsby's false imprisonment claim will therefore be denied.[3]

    *2.  Officers*

The parties agree that the governing standard for a common-law false-imprisonment claim is "the restraint by one person of the physical liberty of another without consent or legal justification."  Faniel v. Chesapeake & Potomac Tel. Co., 404 A.2d 147, 150 (D.C. 1979).  There is no dispute that Goolsby's physical liberty was restrained.  The issue then is whether Goolsby has pled sufficient facts to establish that MPD did not have a legal justification to detain him.  For a full-scale arrest, police must have probable cause to believe that a crime has been, or is

---

[3] Goolsby's voluntary dismissal of the lone remaining constitutional claim against the dispatchers suggests the false imprisonment claim against them might meet the same fate.  But that is for Goolsby to decide, not the Court.

being, committed, <u>Brown v. Illinois</u>, 422 U.S. 590 (1975); for a brief investigatory detention, officers must have reasonable suspicion of the same, <u>Terry v. State of Ohio</u>, 392 U.S. 1 (1968). The officers contend that reasonable suspicion arose from the report they received on the dispatch regarding a possible crime in progress. Officers' MTD at 9. They further argue that Goolsby's decision to flee "only served to heighten the suspicion that the officers needed to investigate whether he was involved in criminal conduct." <u>Id.</u> at 9.

The facts may well show that the officers acted properly on the information they received from the 911 dispatchers and in response to Goolsby's flight. But their argument puts the cart before the horse. There are several (largely factual) disputes that must be resolved in order to determine whether the officers had the legal justification to detain Goolsby. To name but a few:

1) Did the officers subject Goolsby to a <u>Terry</u> stop or an arrest? Though the officers used force to apprehend Goolsby, and then later put him in handcuffs, that does not automatically turn a <u>Terry</u> stop into a full-blown arrest. <u>See</u> <u>Hall v. District of Columbia</u>, 876 F.3d 138, 153 (D.C. Cir. 2017). Depending on how long Goolsby remained handcuffed, it is possible that what was initially a <u>Terry</u> stop evolved into an arrest—and an arrest, of course, requires probable cause, not mere reasonable suspicion.

2) At what point in the episode did the various officers develop either reasonable suspicion or probable cause that Goolsby was committing, or had committed, a crime? Was it the dispatch alone? Was the information contained in the dispatch enough on its own to provide reasonable suspicion?

3) On the other hand, if discovery reveals that some of the officers developed reasonable suspicion only after Goolsby decided to flee, then what was their legal justification for attempting to stop Goolsby in the first instance? [4]

---

[4] To take just one example of how important these factual questions are, consider the transcript of a call that Goolsby attaches to (and references in) his opposition, where a responding officer tells the dispatcher "It says they may be trying to rob. They weren't doing anything suspicious when I walked—drove past them. Do you have a callback [for the 911 caller]?" Pl's Opp., Ex. 1, ECF No. 26-1, at 3. While this exhibit is outside the pleadings and thus is beyond the Court's review on a motion to dismiss, the Court notes this as one example of why dismissal would be premature. Goolsby has alleged that the dispatchers' report would not give rise to a reasonable suspicion to stop Goolsby—which is all he must do—and evidence like

While the government suggests that the dispatch report by itself provided the officers with reasonable suspicion, the pleadings alone lack the necessary details to resolve the issue, such as a description of the individuals provided by the dispatch, a description of the reported "criminal activity," a location, the timing between when the dispatch occurred and when the police officers arrived at the scene, and if the identity of the caller was known at the time of the message. That information is necessary to determine whether the dispatch report actually did supply the officers with reasonable suspicion. See Bennett v. United States, 26 A.3d 745, 753 (D.C. 2011) (listing factors that support reasonable suspicion); cf. United States v. Stubblefield, 820 F.3d 445, 448-451 (D.C. Cir. 2016) (emphasizing that level of detail in witness descriptions and informant tips was key in finding reasonable suspicion existed).

And while the officers contend that Goolsby's flight only "heighten[ed] the suspicion that the officers needed to investigate whether he was involved in criminal conduct," Officers' MTD at 9, they do not make clear whether that solidified their reasonable suspicion or instead ratcheted pre-existing reasonable suspicion up to probable cause. That distinction is a critical one. Stubblefield teaches that, if the officers needed probable cause to detain Goolsby in the manner they did, their case would be far stronger if the dispatch report by itself furnished the officers with reasonable suspicion. 820 F.3d at 451 ("[W]hile flight alone cannot sustain a finding of probable cause, it *can* when coupled with pre-existing reasonable and articulable suspicion." (internal quotation marks and citation omitted)).

---

this, when properly considered at summary judgment, is the sort that might substantiate his allegation.

At bottom, then, in order for Goolsby to properly challenge the officers' reasons for stopping him, he should know the exact basis, as explained by the officers, for the seizure. Based simply on the pleadings, it is difficult to determine at what point the seizure occurred and at what point the facts as understood by the police officers gave rise to the legal justification necessary to defeat a false imprisonment claim. The Court will therefore deny the officers' motion to dismiss the claim.

One final point bears mention. Allowing this claim to proceed is not inconsistent with the Court's prior dismissal of Goolsby's false arrest claim under the Fourth Amendment. See Goolsby, 317 F. Supp. 3d 582 at 591-93. In that decision, the Court did not hold that the officers committed no constitutional violation but found instead that "any constitutional violation committed by the Officers was not clearly established." Id. at 591. That was because Goolsby had failed to identify any case involving similar facts—where officers allegedly relied on a dispatch report and the suspect took flight—to establish "that no reasonable officer would have believed the officers' actions in stopping Goolsby were constitutional." Id. at 592. The available authority in fact pointed to the opposite conclusion, including Navarette v. California, 572 U.S. 393 (2014), in which the Supreme Court held that an anonymous tip can furnish reasonable suspicion to detain someone for investigative purposes. See Goolsby, 317 F. Supp. 3d at 592. To survive a motion to dismiss his common-law claim, however, Goolsby need not show that existing (and controlling) authority clearly established the unlawfulness of the officers' actions. He need only state facts that give rise to a plausible claim to a right to relief, and the Court concludes that Goolsby has carried that relatively light burden.

C.  Count III: Assault and Battery

D.C. law defines assault as "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." Etheredge, 635 A.2d at 916 (quoting Standardized Civil Jury Instructions for the District of Columbia, No. 4.06A (4th ed. 1993)). Battery, meanwhile, is "an intentional act that causes a harmful or offensive bodily contact." Id. (quoting Restatement (Second) of Torts § 18).  Goolsby alleges that one of the responding officers, acting on the dispatchers' false information, committed an assault by "driving a police cruiser at a high rate of speed directly at" him, while the other officers did likewise by surrounding and threatening him. Am. Compl. ¶¶ 75-76.  He further alleges that the officers committed a battery by "violently throwing [him] to the ground and wrenching his arm unnaturally." Id. ¶ 76.

But as the officers note, police are privileged to make a "threat" or cause "offensive contact" when carrying out their law enforcement responsibilities, "so long as the means employed are not in excess of those which [they] reasonably believe[] are necessary." Dormu v. District of Columbia, 795 F. Supp. 2d 7, 27-28 (D.D.C. 2011).  The officers contend that, even accepting Goolsby's version of events, their actions were reasonably necessary to stop Goolsby. In determining what amount of force is necessary, courts put themselves in the place of "a reasonable officer on the scene, with allowance for the officer's need to make quick decisions under potentially dangerous circumstances." Id.  Many courts have acknowledged that this inquiry is similar to the excessive force analysis under § 1983.  See id.; Rogala v. District of Columbia, 161 F.3d 44, 57 (D.C. Cir. 1998); Mazloum v. District of Columbia Metro. Police Dep't, 576 F. Supp. 2d 25, 42 (D.D.C. 2008); Jackson v. District of Columbia, 412 A.2d 948, 956 (D.C. 1980). Cf. Hargraves v. District of Columbia, 134 F. Supp. 3d 68, 90-91 (D.D.C.

2015) (differentiating the § 1983 excessive force and assault and battery standard because the qualified immunity test is a purely objective standard while the assault and battery standard has a subjective component because the officer must have actually believed that "he or she used no more force than necessary").[5]

As with the false imprisonment claim, however, unresolved factual disputes stand in the way of dismissal. Most importantly, as the Court has already explained, various questions remain regarding the legal sufficiency of the justification for the initial stop. It is difficult to assess the reasonableness of the officers' threats and subsequent physical force without knowing what precipitated those acts. If the officers lacked the reasonable suspicion to conduct even an investigatory stop, the decision to approach Goolsby as aggressively as he alleges would probably be unjustified; similarly, if the officers lacked reasonable suspicion in the first place, the fact of Goolsby's flight alone would not likely provide ample justification for tackling him to the ground. Said another way, an officer cannot "reasonably believe[] [it is] necessary" to drive full speed at an unsuspecting civilian if he does not have good reason to think that person has done anything wrong, nor can officers "reasonably believe[] [it is] necessary" to tackle and handcuff someone they do not think has committed a crime. Dormu, 795 F. Supp. 2d at 27. Because these potentially decisive factual disputes remain in limbo, the Court finds that

_____

[5] As this Court stated in Campbell v. District of Columbia, in making a reasonableness determination for the purposes of a § 1983 excessive force claim, "the D.C. Circuit has set forth four factors for courts to consider: (1) the facts and circumstances of the particular case, (2) the severity of the crime, (3) whether the plaintiff posed an immediate threat to the safety of the officers or other individuals, and (4) whether the plaintiff was actively resisting arrest or attempting to flee. 245 F. Supp. 3d 78, 89 (D.D.C. 2017) (citing Wasserman v. Rodacker, 557 F.3d 635, 641 (D.C. Cir. 2009)). The assessment should be "objective," i.e., the subjective intent of the arresting officer has no bearing on the outcome of the analysis. See id.

dismissal without full discovery is premature.  Cf. Harris v. U.S. Dep't of Veterans Affairs, 776

F.3d 907, 915 (D.C. Cir. 2015) (denying summary judgment where unresolved factual disputes

made it impossible to assess reasonableness of officers' conduct).  Tellingly, most of the cases

the officers cited in support of their motion to dismiss were in fact resolved at the summary

judgment stage.  See Officers' MTD at 14-15.  The Court will therefore deny the officers'

motion to dismiss the assault and battery claims.

It will also deny the dispatchers' motion on the same claim.  Though it strikes the Court

as highly unlikely that Goolsby will be able to adduce evidence suggesting the dispatchers acted

with the intent required to sustain an assault or battery claim when they relayed allegedly false

information to the officers, Goolsby has nevertheless alleged that their conduct was "intentional,

willful, reckless, wanton, and in gross disregard of [Goolsby]'s rights."  Am. Compl. ¶ 75.

Consistent with its prior ruling on Goolsby's constitutional claims against the dispatchers, the

Court will allow them the opportunity to substantiate that allegation through discovery.

D.  Count VI: Intentional Infliction of Emotional Distress

To prevail on an intentional infliction of emotional distress ("IIED") claim under D.C.

law, a plaintiff must show: "(1) extreme and outrageous conduct on the part of the defendant that

(2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress."  Liser,

254 F. Supp. 2d at 106 (quoting Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002)).

To satisfy the first element, the alleged conduct must be "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community."  Id. (quoting Drejza v. Vaccaro, 650

A.2d 1308, 1312 n.10 (D.C. 1994)).  The D.C. Circuit has held that excessive force can

constitute outrageous behavior, and that the requisite intent can be "inferred, either from the very

outrageousness of the defendant's acts . . . or when the circumstances are such that any

reasonable person would have known that emotional distress and physical harm would result"—

which is usually a factual question for the jury.  Harris, 776 F.3d at 917.  As for the injury

element, severe emotional distress does not require proof of physical injury or impact, but

typically must be "so acute that harmful physical consequences are likely to result."  Hargraves,

134 F. Supp. 3d at 93.  Such standards present a high bar for plaintiffs to prevail on IIED claims.

See id. ("This common law claim has been described as a very narrow tort with requirements

that are rigorous, and difficult to satisfy." (quoting Snyder v. Phelps, 562 U.S. 443, 464-65

(2011) (Alito, J., dissenting))).

       But at the motion to dismiss stage, courts are not evaluating the likelihood of success,

but rather whether the plaintiff has alleged any set of facts that would entitle him to relief.  See

Liser, 254 F. Supp. 2d at 106 ("Here, plaintiff's *allegations* regarding defendants' conduct—that

[the] officers recklessly and intentionally fabricated facts in order to support [plaintiff's]

unjustified arrest and continued detention—are sufficient to *state a claim* of intentional

infliction."); Garay v. Liriano, 839 F. Supp. 2d 138, 143 (D.D.C. 2012) ("The District of

Columbia Court of Appeals has held that, although this can be an issue for the court, it should be

submitted to the jury if reasonable people could find the conduct complained of meets the

'outrageous' standard.").

       Even so, Goolsby's complaint falters at the first element.  He does not allege conduct by

either the dispatchers or officers "so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community."  Liser, 254 F. Supp. 2d at 106.

First, the dispatchers.  Based on the allegations in the complaint, the relaying of false information under the circumstances here—even if done intentionally—does not rise to the level of outrageousness required to state a claim for IIED.  Goolsby alleges that the 911 caller did not actually report a robbery, but only told the dispatchers that the three men—Goolsby and two friends—made her nervous by standing so close to her in the ATM vestibule at the bank.  The dispatchers, in turn, allegedly reported to the officers that there had been an attempted robbery or that one was imminent.  Even if fact-finding bore out that allegation, the chasm between what the 911 caller said and what the dispatchers reported is not so wide as to render the dispatchers' actions "beyond all possible bounds of decency," "atrocious," and "utterly intolerable in a civilized community."  See Liser, 254 F. Supp. 2d at 106.  The Court will therefore dismiss the IIED claim against the dispatchers.

Next, the officers.  Goolsby's theory of the case, and in particular his belief that the dispatchers played a critical part in causing his injuries, proves fatal to his IIED claim against the officers.  Goolsby alleges that the officers, relying on an allegedly false dispatch report, believed they were responding to an attempted robbery or other crime in progress.  Am. Compl. ¶¶ 29-34.  Even if, as the Court has already discussed, that dispatch report did not furnish an adequate basis for reasonable suspicion or probable cause, surely it prevents the officers' decision to approach Goolsby from qualifying as "beyond all possible bounds of decency" and "utterly intolerable in a civilized community."  See Liser, 254 Supp. 2d at 106.  The dispatch may have been mistaken, and the officers may have been mistaken to rely on it, but that does not mean their actions were sufficiently beyond the pale to form the predicate of an IIED claim.

Comparison to other cases involving an IIED claim based on alleged police misconduct confirms this conclusion.  Amons v. District of Columbia provides one helpful guidepost.  231 F.

Supp. 2d 109 (D.D.C. 2002). In that case, the complaint alleged that "police officers unlawfully entered and searched [the plaintiff's] home without justification, that the police officers killed his pet dog in his home and that they detained him for twenty-two hours." Id. at 118. Those allegations, especially where the record contained "insufficient information . . . to determine whether there was probable cause to arrest plaintiff," were enough to substantiate an IIED claim at the motion-to-dismiss stage. Id. Rogala, meanwhile, slots in at the other end of the spectrum. 161 F.3d at 57. There, the plaintiff alleged that officers threatened to arrest her, "yelled and cursed at her," laughed at her hearing impairment, and detained her for over three hours. Id. at 57. The district court held that, even if these allegations were true, they did not constitute outrageous conduct that could sustain an IIED claim. Id. at 58 (summarily affirming district court). Goolsby's allegations—especially given his claim that the officers were acting on bad information provided by the dispatchers—are far closer to the more benign facts found in Rogala than to the stomach-churning ones at issue in Amons.

For these reasons, the Court will dismiss Goolsby's IIED claim against both the dispatchers and the officers.

## IV. Conclusion

For the foregoing reasons, and as detailed above, the Court will grant in part and deny in part both motions to dismiss. A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: January 11, 2019